# Supreme Court of Texas

No. 22-0521

Roberto Alonzo and New Prime, Inc.,

*Petitioners,*

v.

Christine John and Christopher Lewis,

*Respondents*

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

**PER CURIAM**

Justice Lehrmann did not participate in the decision.

Probable harm from improper jury argument is presumptively remediable by retraction or curative instruction. Incurable argument is rare, but counsel in this personal-injury case crossed that line with an uninvited accusation of discriminatory animus. We therefore reverse and remand for a new trial.

Christine John and Christopher Lewis were injured in a rear-end collision involving a tractor-trailer driven by Roberto Alonzo. In the ensuing personal-injury suit, the plaintiffs sought noneconomic damages and exemplary damages. Alonzo and his employer, New

Prime, Inc., conceded liability for Alonzo's negligence, leaving damages as the only issue at trial. The jury awarded $12 million to John and $450,000 to Lewis for physical pain and mental anguish, but no exemplary damages were assessed because the jury failed to unanimously answer a predicate question. The trial court rendered judgment on the jury's verdict.

Alonzo and New Prime sought a new trial on various grounds, including that plaintiffs' counsel inflamed the jury with an unprovoked accusation of race and gender bias. The motion was overruled by operation of law, and the court of appeals affirmed the judgment. 647 S.W.3d 764, 770-71 (Tex. App.—Houston [14th Dist.] 2022). Although a new trial is "strong medicine," the remedy is warranted on this record. *See In re Rudolph Auto., LLC*, 674 S.W.3d 289, 296 (Tex. 2023).

Harm from improper jury argument is usually curable by a "retraction of the argument or instruction from the court." *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008). But in rare instances, argument may be "so inflammatory and prejudicial" that its harmfulness is incurable. *Tex. Emp. Ins. Ass'n v. Haywood*, 266 S.W.2d 856, 859 (Tex. 1954). Whether that threshold has been breached depends on "the amount of harm from the argument." *Living Ctrs.*, 256 S.W.3d at 681. The test is "whether the argument, considered in its proper setting, was reasonably calculated to cause such prejudice to the opposing litigant that a withdrawal by counsel or an instruction by the court, or both, could not eliminate the probability that it resulted in an improper verdict." *Id.* (quoting *Haywood*, 266 S.W.2d at 858). This inquiry requires an evaluation of the case as a whole—beginning with voir dire and ending with closing argument—and includes an assessment of whether the complaining party invited or provoked the

2

argument. *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839-40 (Tex. 1979). Here, Alonzo and New Prime have met the high burden of demonstrating that the injection of new and inflammatory matters into the case through argument was incurably harmful.

Plaintiffs' counsel first introduced the concept of race and gender bias when questioning potential jurors about their willingness to award as much as $12 million for "invisible" injuries. In response to a venireperson's comment that a man she had trained "ended up making three times more" money than her for the same job, counsel remarked: "Well, it's funny you bring that up because on my fear list . . . that I write before I talk to every jury panel, I have on here [that] there are studies where wom[e]n are awarded for the same injuries less money than men." In questioning another panel member about whether an injured party's income should factor into determining pain and suffering, counsel again noted, "because it goes back to what we talked about, you know, like a woman—there's studies that show a woman—her damages are usually less than a man for the same injuries, and sometimes it's like if someone is—does it matter if my client is African-American?" Following a collective response of "no," voir dire concluded without further comment on race and gender disparities.

There is nothing inherently improper in this line of questioning about potential juror bias. But with the jury having been sensitized to concerns about discriminatory damage awards, plaintiffs' counsel circled back to the topic during closing argument with a pointed attack on opposing counsel.

Repeating the refrain that Alonzo and New Prime "just want a discount" on damages, counsel predicted that, in lieu of the $10 to $12 million John was seeking in compensatory damages, defense counsel

3

would request an award of "like 4 or 5 million dollars."  He then urged the jury to reject such a "discount" "because that's the cost of doing business for them" and "[p]artial justice is no justice."  Before yielding the floor, counsel concluded by asserting, "[T]hey want to discount, and I don't think you have to discount a human being's life.  And I ask you to award the full damages."  But when defense counsel instead asked the jury to award John no more than $250,000, plaintiffs' counsel retorted in rebuttal:

> We don't want the 4 or 5 million dollars.  And now we certainly don't want this $250,000.
>
> . . . .
>
> We don't want their 4 or 5 million dollars.  That's not fair. *Because it's a woman, she should get less money?  Because she's African American, she should get less money?*  No. We're going to fight because we believe in the jury system.

(Emphasis added.)   This prompted defense counsel to object that "personally attacking counsel is improper."  *See* TEX. R. CIV. P. 269(e).

Addressing the matter at a bench conference, the court asked plaintiffs' counsel "to limit [his] argument to the evidence admitted in this case" and to refrain from "attack[ing] opposing counsel personally." In admonishing counsel, the judge explained: "[M]y bigger issue is that you interjected the fact that she was African-American and she's a woman; and I didn't hear anything on the other side referring to that as a basis for denying them recovery."  At that point, defense counsel moved for a mistrial "based upon the racial bias" the court had identified, but the motion was overruled.

Although no retraction or curative instruction was requested or given, none was required because the argument "struck at the heart of

the jury trial system, was designed to turn the jury against opposing counsel and his clients, and was incurable." *See Living Ctrs.*, 256 S.W.3d at 682. An appeal to racial prejudice is a paradigmatic example of incurable jury argument. *See id.* at 681. Such a tactic strikes at the "fairness and equality of justice" by inducing the jury to consider a party's race as a factor in reaching its decision. *Id.* "[N]o court of justice ought for a moment to tolerate" such an argument because cases should always be tried and determined on the facts proven. *Moss v. Sanger*, 12 S.W. 619, 620 (Tex. 1889); *see also United Rentals N. Am., Inc. v. Evans*, 668 S.W.3d 627, 631 (Tex. 2023) (upholding our judiciary's "obligation to provide race-neutral proceedings"); *Living Ctrs.*, 256 S.W.3d at 681 ("Trial courts are not required to wait for objections before correcting improper argument, but should guard against such conduct and correct it *sua sponte*." (citing TEX. R. CIV. P. 269(g))).

This case presents the flip side of that coin. Recognizing that racial prejudice and discrimination are opprobrious in a civilized society, a natural human instinct is to recoil and repudiate it. Pointing the finger at opposing counsel results in palpable harm by undermining the basic premise that a trial provides impartial and equal justice. *See Living Ctrs.*, 256 S.W.3d at 681. Although "[n]ot all personally critical comments concerning opposing counsel are incurable," we have condemned a functionally analogous attack on opposing counsel as overstepping the mark. *Id.* at 681-82.

In *Living Centers*, a nursing-home resident died after being dropped by one of the nursing home's employees. *Id.* at 679. In the heirs' wrongful-death suit, plaintiffs' counsel equated opposing counsel's argument for a lesser damages award with atrocities committed against the elderly and infirm in Nazi Germany's World War II T-4 Project. *Id.*

5

at 680. The improper argument was incurable because it "was designed to incite passions of the jury and turn the jurors against defense counsel for doing what lawyers are ethically bound to do: advocate clients' interests within the bounds of law." *Id.* at 682. In other words, the nursing home's attorney was "entitled to urge a smaller damages amount than the plaintiffs sought without being painted as modern-day equivalents of T-4 Project operators." *Id.* So too here.

Alonzo and New Prime were entitled to suggest a smaller damages amount than John sought without being accused of invidious discrimination. We are not persuaded by the court of appeals' conclusion that plaintiffs' counsel merely asked the jury to reject implicit bias in their own deliberations. *See* 647 S.W.3d at 785. After repeatedly stating that Alonzo and New Prime wanted a "discount," counsel told the jury, "We don't want the 4 or 5 million dollars. And now we certainly don't want this $250,000," which he then followed up with an accusation: "Because it's a woman, she should get less money? Because she's African American, she should get less money?" One need not be a linguistic expert to understand the subtext of this argument. Counsel pointedly insinuated that Alonzo and New Prime sought a lower damages amount because John is a black woman. That is not a request for the jury to set aside an implicit bias; that is a charge of race and gender discrimination.

This inflammatory argument was uninvited and unprovoked. At no point did the defendants or their counsel indicate any prejudice against John based on her race or gender, nor did they urge the jury to award her less money because of these immutable characteristics. In fact, the topic of whether John's race and gender should affect her damages award started and ended with plaintiffs' counsel. Extreme and unsupported personal attacks on the opposition "damage the judicial

6

system itself" by striking at the impartiality, equality, and fairness of justice rendered by the court. *See Living Ctrs.*, 256 S.W.3d at 681. Courts should, and do, "countenance very little tolerance of such arguments." *Id.*; *see* TEX. R. CIV. P. 269(e) ("Mere personal criticism by counsel upon each other shall be avoided, and when indulged in shall be promptly corrected as a contempt of court.").

Accordingly, without hearing oral argument, we grant the petition for review, reverse the court of appeals' judgment, and remand the case to the trial court for further proceedings.[1] *See* TEX. R. APP. P. 59.1.

**OPINION DELIVERED:** May 10, 2024

---

[1] We do not reach Alonzo and New Prime's remaining issues, which include complaints about unsubstantiated anchoring. Last term, the Court clarified that claimants cannot rely on unsubstantiated anchoring to sustain a damages award. *See Gregory v. Chohan*, 670 S.W.3d 546, 558 (Tex. 2023) (plurality op.) ("Unsubstantiated anchors . . . have nothing to do with the emotional injuries suffered by the plaintiff and cannot rationally connect the extent of the injuries to the amount awarded."); *id.* at 569 (Devine, J., concurring) ("[Claimants] cannot engage in 'unsubstantiated anchoring' by asking fact-finders to rely on evidence that has nothing to do with the pain or anguish they've suffered."); *id.* at 576 (Bland, J., concurring) ("Counsel's unchecked directives to the jury to employ mental anguish measurements based on standards that depart from the evidence render the verdict legally infirm under long-standing common law."). In this case, plaintiffs' counsel's comparisons to a van Gogh painting worth $90 million, multi-million-dollar athlete and CEO salaries, and the value of New Prime's trucking fleet and warehouses are of the same ilk as those disapproved in *Chohan*.

7